# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EMMY GRACE CLARK, et al.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:25-cv-02050-RCL** |
| **DISTRICT OF COLUMBIA, et al.,** | |
| **Defendants.** | |

## FOURTH AMENDED COMPLAINT

RECEIVED

JUL 2 1 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia



## INTRODUCTION

1.  This Fourth Amended Complaint ("*4AC*") challenges a **pattern of disability discrimination, retaliation, and reckless disregard for student safety** by the District of Columbia Public Schools ("*DCPS*") and its senior officials.

2.  Plaintiffs proceed **exclusively under federal law**—§ 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act ("*ADA II*"), and 42 U.S.C. § 1983 for First- and Fourteenth-Amendment violations.

3.  All local-law counts that appeared in the Second Amended Complaint remain **preserved but not re-pleaded here**; Plaintiffs reserve the right to pursue them in D.C. Superior Court if severance and remand are later granted. See 28 U.S.C. § 1367(c) & (d).

4.  Since 18 December 2024 Plaintiffs have filed **68 written safety grievances**; DCPS has missed **89.6 % of its own response deadlines**, thereby cementing the deliberate-indifference and retaliation patterns detailed in Counts I–X.

5.  On 16 July 2025 the parties jointly proposed (ECF No. 11) that Plaintiffs be allowed to file this 4AC on or before **21 July 2025**, after which Defendants will answer or move to dismiss. The 4AC is therefore submitted **with the District's consent as to timing**, without prejudice to any Rule 12 defenses.

6.  Because unresolved hazards continue to place the children at imminent risk—and no § 504 meeting has been convened despite a 30-day request—Plaintiffs will file a **motion for temporary restraining order and preliminary injunction** contemporaneously with this pleading.

## JURISDICTION & VENUE

7. This Court has subject-matter jurisdiction under **28 U.S.C. §§ 1331 (federal question) and 1343(a)(3)–(4) (civil-rights jurisdiction)**.

8. Declaratory and injunctive relief are authorized by **28 U.S.C. §§ 2201–2202** and **Fed. R. Civ. P. 57 & 65**.

9. Venue lies in this District under **28 U.S.C. § 1391(b)(1)–(2)** because all Defendants reside—and the events occurred—within the District of Columbia.

10. No party contests personal jurisdiction.

11. *Exhaustion.* The gravamen of the federal counts is physical safety, retaliation, and constitutional injury—not denial of FAPE—so administrative exhaustion under the Individuals with Disabilities Education Act is **unnecessary**. See *Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859 (2023).

## PARTIES

12. **Emmy Grace Clark** is a District resident and the mother of **E.K.S.C. (11)** and **C.A.C. (8)**. She sues individually and as **next friend** pursuant to Fed. R. Civ. P. 17(c)(2).

13. **District of Columbia** is a municipal corporation that operates DCPS.

14. **Lewis D. Ferebee, Ed.D.** is the Chancellor of DCPS (official capacity).

15. **Antoinette S. Mitchell** is State Superintendent of Education (official capacity).

16. **Eric Bethel** is Instructional Superintendent for Cluster V (official capacity).

17. **Danielle A. Singh** is Principal of Janney Elementary School (official capacity).

18. **Nicole Ugel, Ph.D.** is Assistant Principal of Janney (official capacity).

19. **Shellie Wood, Ph.D.** is Director of Student Services at Janney; she is sued in her **individual capacity** (Count IX) and official capacity (all counts).

## PROCEDURAL POSTURE

20. Plaintiffs filed their original complaint in Superior Court on 21 May 2025; Defendants removed on 27 June 2025 (ECF No. 1).

21. Three amended pleadings followed (ECF Nos. 7, 9, 10). To streamline issues, the parties **stipulated to a 21 July 2025 deadline** for this 4AC and a briefing schedule on Defendants' anticipated Rule 12 motion (ECF No. 11).

22. The District asserts that Plaintiffs' prior motion to sever and remand local-law claims (ECF No. 6) is "*moot.*" Plaintiffs continue to **preserve the sever/remand request**, and nothing in this 4AC should be construed as a waiver of that position.

23. A **Rule 26(f) conference** is scheduled on or before 1 August 2025.

## COUNTS

**COUNT I – Deliberate Indifference to Student Safety**

*42 U.S.C. § 1983 – Substantive Due Process & Monell; in the alternative, § 504 of the Rehabilitation Act / ADA Title II*

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. Under the Fourteenth Amendment's substantive-due-process guarantee, students possess a liberty interest in bodily integrity and reasonably safe public-school environments; 42 U.S.C. § 1983 supplies the cause of action.

3. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibit defendants, as public entities receiving federal funds, from excluding qualified students with disabilities from the benefits of a safe, non-discriminatory education.

4. **District of Columbia Public Schools ("*DCPS*")** is liable under Monell because the injuries alleged arose from official customs, policies, or failures to train and supervise that exhibit deliberate indifference to known risks.

*FACTUAL ALLEGATIONS*

5. <u>Known Slip Hazard Ignored</u>

   a. For over a year the twin drinking fountains by the rear entrance/gym remained unrepaired—one disabled, the other leaking onto the floor—contrary to DCPS's Facility Maintenance & Safety Protocol, which requires immediate remediation or closure.

   b. Custodians occasionally placed cones but rarely dried the area. Plaintiffs documented standing water on at least five occasions and repeatedly alerted school administrators; Principal Danielle Singh responded that "*there's nothing we can do.*"

   c. On 4 April 2025 minor Plaintiff E.K.S.C., wearing a medical boot, nearly slipped; other students and adults have likewise slipped or nearly slipped. The hazard persists.

6. <u>Unsecured Garden & Tools</u>

   a. Throughout school-year 2024-25 students routinely entered an unfenced outdoor garden without adult supervision, removed tools from an unlocked shed, threw rocks, built unstable structures, and engaged in other hazardous conduct.

   b. On one occasion E.K.S.C. crawled under shrubbery to escape bullying, lacerating her forehead and suffering a panic attack.

   c. Plaintiff reported the garden hazards in writing on 4 Apr., 23 Apr., 16 May, and 6 June 2025, requesting locks, fencing, and assigned staff. DCPS took no corrective action.

7. Elevator-Access & Evacuation Failures

    a. While recovering from foot fractures (Mar.–Apr. 2025), E.K.S.C. required elevator use. Staff held the only master key, forcing her to search hallways for an adult and subjecting her to peer ridicule.

    b. At a 2 Apr. 2025 safety-plan meeting, administrators acknowledged the issue but supplied no additional keys or safeguards.

    c. On 3 Apr. 2025, during a fire drill, a staff member gave E.K.S.C. the master key and permitted her to ride alone—violating the ban on elevator use during alarms and the rule that master keys remain with staff. DCPS conducted no retraining.

8. Repeated Lapses in Supervision

    a. Between 18 Dec. 2024 and 17 July 2025 Plaintiffs filed **68 written safety grievances**; DCPS missed 240 of 268 statutory or contractual response deadlines (≈ 90 %). A DCPS investigator admitted staff had "*game-planned*" delays to let deadlines expire.

    b. Illustrative incidents:

        i. 1 Apr. 2025 – Assistant Principal Nicole Ugel left two students unsupervised in her office; a fight erupted, frightening E.K.S.C. in an adjacent room.

        ii. 12 March 2025 – Two Fourth-Grade students exited the building unsupervised and became locked in an underground staff parking garage.

        iii. 2 May 2025 – Approximately 20 students were left alone in an unlocked classroom until a paraprofessional arrived.

        iv. 6 May 2025 – Two Pre-K students left campus unsupervised.

    v.   8 May 2025 – Bus filled with smoke; staff failed to evacuate until Plaintiff intervened.

    c.  DCPS's Safe & Positive Schools Policy requires continuous adult supervision; no corrective measures followed any of the above incidents.

9. <u>Failure to Implement Agreed Safety Accommodations</u>

    a.  On 23 May 2025 DCPS issued a written Student Support & Success Plan requiring that, during noise spikes, E.K.S.C. be released to a quiet location and receive daily check-in/check-out ("*CICO*").

    b.  On 30 May 2025 substitutes denied her request to leave a loud classroom; she suffered a panic attack and texted Plaintiff from a restroom. Staff later admitted the Plan "*was not followed.*"

    c.  During 9–11 June 2025 the responsible counselor was absent; CICO was not provided, and E.K.S.C. walked hallways unsupervised. A written § 504 plan incorporating contingency measures is still pending.

*MUNICIPAL LIABILITY (Monell)*

10. DCPS's pervasive failure to enforce its Safe & Positive Schools Policy, Recess Guidance, Facility Maintenance & Safety Protocol, and Student Bill of Rights—coupled with

    a.  missed grievance deadlines,

    b.  document "*freezes,*" and

    c.  Principal Singh's June 20 2025 e-mail stating, "*We are not in a position to revisit or resolve these matters through direct school-level meetings*"

11. —constitutes an official custom of non-engagement and deliberate indifference to student safety.

12. DCPS also lacks any **district-wide protocol** to abate hazards once reported.

13. These systemic deficiencies were the moving force behind the injuries alleged.

*INJURIES*

14. Physical injuries

    a.  forehead laceration,

    b.  aggravated foot fracture,

    c.  near-fall on wet flooring;

15. Psychological injuries

    a.  heightened anxiety,

    b.  panic attacks,

    c.  nightmares,

    d.  suicidal ideations,

    e.  clinically significant anxiety and depression diagnosed by a **psychiatrist, two therapists**, and **three physicians**;

16. Educational injuries

    a.  loss of instructional time

    b.  measurable academic regression; and

17. Economic losses

    a.  out-of-pocket expenses for medical care, therapy, and tutoring.

*CLAIMS FOR RELIEF*

18. Declaratory Relief

    a.  Plaintiffs request a declaration that

    i.   Defendants' acts and omissions violated Plaintiffs'

substantive-due-process rights and, alternatively, rights secured by § 504

and ADA Title II.

19. Injunctive Relief

   a.  Plaintiffs request that the Court enjoin Defendants, within 45 days, to:

   b.  provide continuous adult supervision in compliance with the Safe & Positive

Schools Policy;

   c.  secure the garden with fencing, locks, and assigned staff;

   d.  repair or remove hazardous drinking fountains and implement a drying regimen;

   e.  supply elevator access accommodations, including additional keys and escort

protocols;

   f.  train all personnel on student-safety and disability-accommodation mandates; and

   g.  implement a grievance-response system that meets statutory deadlines.

20. Damages

   a.  Plaintiffs seek nominal, compensatory, and punitive damages commensurate with

Plaintiffs' physical, psychological, educational, and economic harms.

21. Further Relief

   a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

22. WHEREFORE, Plaintiffs respectfully request that the Court grant all declaratory,

injunctive, and monetary relief set forth above, together with costs, reasonable attorneys'

fees, and any additional relief the interests of justice require.

**COUNT II – Disability-Based Harassment & Hostile Environment**

*29 U.S.C. § 794; 42 U.S.C. §§ 12132, 12203; 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. This Count arises under § 504 of the Rehabilitation Act (29 U.S.C. § 794), Title II and the anti-retaliation provision of the ADA (42 U.S.C. §§ 12132, 12203), and the First and Fourteenth Amendments, all enforceable through 42 U.S.C. § 1983.

3. **Minor Plaintiff E.K.S.C.** is a qualified individual with disabilities and entitled to access and protection from disability-based discrimination in a District of Columbia public school.

4. **Defendants District of Columbia, DCPS,** and their agents acted under color of District law; their policies, practices, and customs caused the deprivations alleged herein, establishing municipal liability under Monell.

*FACTUAL ALLEGATIONS*

1. <u>Knowledge of Harassment</u>

    a. On **3 April 2025** E.K.S.C. reported to Principal Danielle Singh, Assistant Principal Ugel, and Counselor Cydney Lewis that faculty gossip and student ridicule were disrupting her learning.

b. On **4 April 2025** Plaintiffs filed a formal grievance against **Digital-Art Teacher Shana Zallman** for berating **Homeroom Teacher Judith Castillo** in front of the class—a spectacle that made E.K.S.C. feel "*ashamed and unsafe.*" DCPS acknowledged receipt but took no interim action.

2. <u>Direct Harassment by Teacher Zallman</u>

a. Between **7 and 11 April 2025**, Zallman told boot-wearing E.K.S.C., "*I've seen you moving just fine at recess—you're faking,*" prompting classmates to chant "*faker*" until she cried. Days later Zallman refused to allow E.K.S.C. to make up missed work, saying, "*You were out—too bad.*"

3. <u>Ignored Reports, Accommodation Failures & Retaliation</u>

a. Plaintiffs notified the school's C.A.R.E. Team and Principal Singh by e-mails on **11 April** and **22 April 2025**; no corrective measures were taken.

b. A written "*Student Support & Success Plan*" dated **23 May 2025** directed staff to release E.K.S.C. to a quiet location during noise spikes. The plan was not followed on **27 May** and **30 May 2025**, when substitute-supervised classrooms became loud, triggering panic episodes that sent E.K.S.C. to the office or restroom in tears.

c. On **30 May 2025**—in front of LICSW Sara Solomon and Principal Singh—Zallman again told E.K.S.C. she could not make up work because of prior absences.

d. After each complaint, Defendants denied make-up work and publicly accused E.K.S.C. of malingering, acts constituting retaliation for protected grievance activity.

4. Admissions Confirming Plan Violations

    a. In a **2 June 2025** meeting Solomon admitted the Support Plan "*was not followed*"
on 30 May; front-office staff were unaware of it; and the classroom remained a
"*hotspot.*"

    b. No revised plan had been issued as of Plaintiffs' **8 July 2025** follow-up.

5. Missed Suicide-Prevention Check-Ins

    a. The plan required daily morning check-ins with Solomon. While Solomon
attended an overnight field trip on **9 and 10 June 2025**, no substitute conducted
the check-ins, leaving E.K.S.C. roaming the halls unsupervised despite prior
notice of her suicide ideation.

6. Additional Teacher Misconduct

    a. On **8 May 2025 Homeroom Teacher Sarah Buscher** led a noisy game during
which E.K.S.C. hid in a supply cubby and sobbed for the remainder of the class
period; Buscher failed to notice her absence.

7. District-Level Notice & Deliberate Indifference

    a. Principal Singh, **Instructional Superintendent Eric Bethel**, and the **C.A.R.E.
Team** received at least five written grievances plus the in-person report of
**3 April 2025** but nonetheless missed all C.A.R.E. deadlines and implemented no
interim protective measures.

8. Resulting Hostile Environment

    a. Defendants' repeated inaction and staff reprisals created a learning environment
so hostile, pervasive, and disabling that E.K.S.C. could not attend class without
risk of panic attacks.

MUNICIPAL LIABILITY (MONELL)

9. DCPS maintains a custom of non-enforcement of grievance deadlines, with an 89 percent failure rate as alleged in Count I;

10. C.A.R.E. Investigator Tron Riley admitted he "*game-planned*" a backlog to delay resolutions.

11. Policymakers Singh and Bethel ratified subordinate misconduct by ignoring written and in-person pleas while acknowledging plan violations;

12. these practices, policies, and customs directly caused the deprivation of Plaintiffs' federal rights.

*INJURIES*

13. As a direct result of Defendants' conduct, E.K.S.C. suffered

   a. panic attacks,

   b. chest tightness,

   c. sleep disturbances, and

   d. educational losses requiring tutoring.

14. Plaintiff and her family incurred therapy expenses, and

15. all family members were treated for clinically significant anxiety attributable to the hostile environment.

*CLAIMS FOR RELIEF*

1. Declaratory Relief

   a. Plaintiffs request a declaration that Defendants' actions and inaction violated Plaintiffs' rights under § 504 of the Rehabilitation Act, Title II and § 12203 of the

ADA, and the First and Fourteenth Amendments enforceable through 42 U.S.C. §
1983.

2. <u>Injunctive Relief</u>

    a. Plaintiffs request that the Court enjoin Defendants to

        i. remove Teachers Shana Zallman and Sarah Buscher from unsupervised
contact with E.K.S.C.;

        ii. provide comprehensive disability-harassment training to all Janney
Elementary staff within forty-five (45) days; and

            1. issue written findings on each pending harassment grievance and
file them with the Court.

3. <u>Damages</u>

    a. Plaintiffs seek

        i. nominal and pecuniary damages under § 504 and ADA Title II;

        ii. compensatory damages, including emotional-distress damages, under 42
U.S.C. § 1983; and

        iii. punitive damages against Shana Zallman in her individual capacity should
discovery confirm willful misconduct.

4. <u>Further Relief</u>

    a. Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs respectfully request that the Court grant the declaratory, injunctive,
and monetary relief detailed above, together with costs, reasonable attorneys' fees, and any other
and further relief the Court deems just and proper.

**COUNT III – Retaliation and Confidentiality Breach**

*29 U.S.C. § 794; 42 U.S.C. § 12132 & § 12203 (ADA Title II); First & Fourteenth Amendments – 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1.  Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2.  This Count arises under the Rehabilitation Act § 504, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203; and the First and Fourteenth Amendments, enforceable through 42 U.S.C. § 1983. Those provisions prohibit public entities from retaliating against individuals for protected disability-related advocacy and from disclosing confidential grievance information without a legitimate educational interest.

*FACTUAL ALLEGATIONS*

3.  <u>Protected Activity</u>

    a.  From **December 18 2024 through July 8 2025**, Plaintiff submitted **more than fifty written grievances** addressing disability hazards, accommodations, harassment, and retaliation—conduct protected by 42 U.S.C. § 12203(a), 29 U.S.C. § 794, and the First Amendment.

4. Barring Rumors

    a. Beginning **April 2 2025**, Principal **Danielle Singh** and other administrators informed staff that Plaintiff would be "*barred from the building,*" although no barring request had been initiated under DCPS policy.

    b. On **April 22 2025**, Director of Strategy **Mike Barnhart** repeated this barring rumor directly to Plaintiff, prompting additional grievances.

    c. On **May 7 2025**, Plaintiff recorded a staff member attributing the rumor to the administration; when confronted, Principal Singh admitted she had intentionally delayed issuing the required bar notice for six weeks.

5. Public Harassment

    a. On **April 11 2025**, teacher **Shana Zallman** publicly called minor **E.K.S.C.** a "*faker*" and refused to provide make-up work.

6. Confidentiality Breach

    a. Also on **May 7 2025**, Student Services Director **Dr. Shellie Wood** forwarded a confidential investigative e-mail to the child's homeroom teacher, who lacked a legitimate educational interest.

7. Attendance Reversal & Threats

    a. After agreeing on **May 14 2025** to excuse the children's absences until hazards were remedied, Superintendent **Eric Bethel** reversed course on **May 15 2025**, froze the ASPEN attendance system, and threatened whistle-blower **Kelly Mastracchio**.

8. <u>Delay in Safety Planning</u>

   a. Despite mounting grievances, Principal Singh and Superintendent Bethel failed to convene any safety-planning meeting for more than a week, evidencing deliberate indifference.

9. <u>False Neglect Report</u>

   a. On **June 10 2025**, Dr. Wood knowingly filed a false neglect report with the **Child and Family Services Agency** (CFSA). CFSA and **MPD** removed and strip-searched the minor plaintiffs; the report was later closed as "*unsubstantiated,*" and the CFSA worker **Darlene Richardson** advised Plaintiff that staff were "*trying to intimidate you.*"

10. <u>Continued Surveillance</u>

    a. After CFSA closed the case, Dr. Wood and Assistant Principal **Niki Ugel** appeared uninvited at the children's classroom events, further heightening the hostile environment.

11. <u>Adverse Action & Causation</u>

    a. The foregoing acts—barring rumors, public harassment, reversal of attendance codes, breach of confidentiality, false CFSA report, and surveillance—would deter a reasonable person from engaging in protected activity under *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006). Temporal proximity and Principal Singh's admission establish but-for causation.

12. <u>Informational-Privacy Violation</u>

    a. Unauthorized disclosure of grievance details to staff without a legitimate educational interest violated Plaintiffs' Fourteenth-Amendment right to

informational privacy. *See Doe v. District of Columbia*,

206 F. Supp. 3d 583 (D.D.C. 2016).

## MUNICIPAL LIABILITY (MONELL)

13. DCPS maintains no written protocol safeguarding parent-grievance confidentiality;

14. Superintendent Bethel and Chancellor Lewis Ferebee ratified the retaliation by ignoring multiple e-mails documenting it; and

15. DCPS's 88 percent grievance-deadline failure rate and C.A.R.E. Investigator Tron Riley's "*game-planned*" delay tactics evidence a widespread custom or practice of suppressing complaints.

## INJURIES

16. Plaintiffs suffered

    a.  emotional distress, including PTSD-like symptoms after the strip-search;

    b.  lost instructional time and tutoring expenses from wrongful absence coding;

    c.  litigation costs; and

    d.  delays in receiving accommodations.

## CLAIMS FOR RELIEF

17. Declaratory Relief

    a.  Plaintiffs request a declaration that Defendants' conduct constitutes unlawful retaliation and a confidentiality breach under ADA Title II, § 504 of the Rehabilitation Act, and the First and Fourteenth Amendments.

18. Injunctive Relief

    a.  Plaintiffs request that the Court enjoin Defendants to:

        i.  adopt and publish a grievance-confidentiality protocol within thirty days;

        ii.  expunge the false CFSA report and all retaliatory attendance codes; and

        iii.  post an anti-retaliation notice at Janney and Cluster V schools for one year.

19. Damages

    a.  Plaintiffs seek:

        i.  nominal and pecuniary damages under the ADA and § 504;

        ii.  compensatory damages, including emotional distress, under 42 U.S.C. §
          1983; and

        iii.  punitive damages against Dr. Shellie Wood in her individual capacity for
          knowingly filing a false CFSA report.

20. Further Relief

    a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

21. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their
favor, grant the declaratory, injunctive, and monetary relief set forth above, and award
any further relief that the interests of justice require.

**COUNT IV – Field-Trip Supervision & Emergency-Response Failures**

42 U.S.C. § 1983 – Substantive Due Process & Monell

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. By escorting children on a school-sponsored outing, DCPS assumed custodial control and owed Plaintiffs a constitutional duty not to act with deliberate indifference to a substantial risk of serious harm, in violation of the Fourteenth Amendment's substantive-due-process guarantee.

*FACTUAL ALLEGATIONS*

3. On 8 May 2025 **Janney Elementary School**, a DCPS campus, conducted a second-grade field trip to the National Mall using a charter bus.

4. Two days earlier, on 6 May 2025, Janney e-mailed **families** warning the trip might be cancelled for lack of **adult chaperones** and soliciting additional **parent volunteers**.

5. DCPS required only fingerprinting and a background check for parent volunteers and furnished no orientation or safety training, yet assigned each parent sole responsibility for supervising **four to five children** throughout the excursion.

6. During the trip **Plaintiff** repeatedly intervened to halt unsafe conduct that went unchecked by school staff, including:

   a. children running around a food truck powered by gasoline generators;

    b.   students leaving the path to play in a roped-off, muddy sprinkler installation;

    c.   children wandering into a wooded area out of staff sight; and

    d.   staff failure to perform headcounts while eating lunch in the shade.

7. At approximately 12:45 p.m. the rear of the charter bus filled with thick smoke while students exited the bus.

8. No teacher or administrator ordered an evacuation. Plaintiff shouted "*Get off the bus!*", opened the rear door with assistance from **two by-standers**, and guided the children to safety while **other parents** hesitated and **Assistant Principal Niki Ugel** and **Teacher Jesse Lima** recorded the incident on a cell phone.

9. **Student A.D.** complained of breathing difficulty; **Assistant Principal Niki Ugel** handed him a bottle of water, took no vital signs, and failed to summon emergency medical services. No headcount was taken and no parent notifications were issued.

10. At 3:03 p.m. the same day, **Principal Danielle Singh** e-mailed **all families** stating that students exited the bus "*out of an abundance of caution a short distance from our planned drop-off,*" omitting any mention of smoke, staff inaction, or medical concern.

11. Plaintiff responded that evening with a detailed account of the smoke emergency; Principal Singh never replied. As of 18 July 2025 DCPS has provided no corrective training or updated policy.

12. On 12 May 2025 Assistant Principal Ugel e-mailed Plaintiff "*thanking [her] for [her] presence during the trip,*" implicitly acknowledging DCPS's reliance on an untrained parent to manage the emergency.

*MUNICIPAL LIABILITY (Monell)*

13. Defendants knew of and disregarded the substantial risk of serious harm by:

    a.   relying exclusively on **untrained parent chaperones** despite acknowledging the staffing shortage;

    b.   failing to issue an evacuation order or conduct headcounts when smoke filled the bus; and

    c.   failing to obtain medical assessment for a child in respiratory distress.

14. These constitutional violations were the product of DCPS policies, customs, or practices in that:

    a.   DCPS maintains no written or in-person safety training for parent chaperones yet assigns them primary supervisory duties;

    b.   Principal Singh's misleading e-mail, together with **higher-level** silence after Plaintiff's grievance, constitutes official ratification of unsafe practices; and

    c.   DCPS's routine failure to meet grievance deadlines, including the 8 May smoke-bus grievance, evidences a pattern of non-response to serious safety complaints.

15. Accordingly, DCPS is liable under Monell for maintaining policies or customs that caused the deprivation of Plaintiffs' Fourteenth-Amendment substantive-due-process rights.

*INJURIES*

16. Defendants' actions and omissions directly caused

    a.   A.D.'s respiratory discomfort,

    b.   C.A.C.'s recurring nightmares and refusal to attend future trips,

    c.   and Plaintiff's anxiety regarding all DCPS off-site events,

    d.   as well as associated economic losses.

*CLAIMS FOR RELIEF*

17. Declaratory Relief

   a. Plaintiffs request a declaration that Defendants' deliberate indifference during and after the 8 May 2025 field trip violated the Fourteenth Amendment.

18. Injunctive Relief

   a. Plaintiffs request that the Court enjoin Defendants to:

      i. deliver a safety briefing to every parent chaperone before departure;

      ii. train Janney staff on emergency evacuation and truthful post-incident communication; and

      iii. file a compliance report with the Court.

19. Damages

   a. Plaintiffs seek compensatory damages for physical discomfort, emotional distress, and out-of-pocket costs, together with nominal damages for the constitutional violation.

20. Further Relief

   a. Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

21. WHEREFORE, Plaintiffs respectfully request that the Court enter the foregoing declaratory judgment, injunctive orders, and monetary awards, and grant all further relief it deems just and proper.

**COUNT V – Visitor-Security Failures**

42 U.S.C. § 1983 – Substantive Due Process; Monell

*INCORPORATION BY REFERENCE*

1.  Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set

    forth herein.

*JURISDICTION & LEGAL BASIS*

2.  This Count arises under the substantive component of the Fifth Amendment's Due

    Process Clause, enforceable through 42 U.S.C. § 1983.

3.  By accepting daily custody of students, the District of Columbia Public Schools

    ("*DCPS*") assumed an affirmative duty not to act with deliberate indifference to

    conditions creating a substantial risk of bodily harm. District of Columbia v. Harris, 770

    A.2d 82, 93 (D.C. 2001).

4.  A municipal entity is liable under Monell when an official policy, custom, or practice is

    the moving force behind a constitutional deprivation.

*FACTUAL ALLEGATIONS*

5.  DCPS's School Visitors Directive requires every non-staff entrant to

    a.  present government-issued identification,

    b.  receive and later return a visitor badge,

    c.  sign in and out with times, and

    d.  remain under front-office supervision.

6. Throughout school year 2024-25 **Janney Elementary ("*Janney*")** failed to enforce each requirement, as follows:

    a. Parents and other adults entered freely through cafeteria and side doors with no ID check;

    b. Visitor badges were seldom issued and almost never collected on exit;

    c. Visitor logs recorded dozens of names without departure times, and Security Officer Jenkins admitted, "*We don't track departures*";

    d. Arrival and dismissal doors were staffed by **student "*Safety Patrol*" members** while security personnel were absent or inattentive.

7. On one morning during that school year Plaintiff twice observed **two apparent homeless minors**, laden with suitcases, seated unchallenged outside Janney's main exit.

8. At least one to two hours elapsed before Janney Elementary School contacted the **Metropolitan Police Department**, which confirmed the children had been "*dropped off*" by an unknown person and had nowhere to go; school security had not noticed their presence.

9. Throughout the year Plaintiff communicated multiple visitor-security breach reports. Singh replied that Janney "*is compliant*," took no corrective action, and made no changes to sign-in procedures.

*MUNICIPAL LIABILITY (Monell)*

10. Visitor logs showed zero recorded sign-outs for the entire school year, evidencing a building-wide custom of ignoring the Directive.

11. Repeated parent alerts were met with the blanket statement "*We are compliant*," demonstrating conscious disregard of a known risk.

12. Principal Singh and cluster leadership—final policy makers for school security—ratified the ongoing violations by declining to enforce the Directive after multiple written complaints.

13. The District's policy and custom of disregarding the Visitors Directive was the moving force behind the constitutional violation and resulting injuries.

*INJURIES*

14. The open-door environment allowed **unknown adults** and **unsupervised minors** carrying all belongings onto campus, heightening risks of abduction and violence.

15. Minor E.K.S.C. suffered panic episodes, and Plaintiff incurred additional childcare costs to arrange alternative after-school supervision.

*CLAIMS FOR RELIEF*

16. Declaratory Relief

    a. Plaintiffs request a declaration that the District's deliberate indifference to visitor-security breaches violates students' substantive due-process rights.

17. Injunctive Relief

    a. Plaintiffs request that the Court enjoin Defendants, within 15 days, to:

        i. enforce ID checks, badge issuance and return, and dual sign-in/out at every Janney entrance;

        ii. assign trained adult staff—not students—to monitor doors during arrival, dismissal, and after-care; and

        iii. file monthly visitor-log summaries with the Court for one year.

18. <u>Damages</u>

    a.  Plaintiffs seek

        i.   nominal and pecuniary damages under § 504 of the Rehabilitation Act and Title II of the ADA, and

        ii.  compensatory damages under 42 U.S.C. § 1983 for emotional distress and childcare expenses.

19. <u>Further Relief</u>

    a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

20. WHEREFORE, Plaintiffs respectfully request that the Court grant the relief detailed above, enter judgment in their favor, and retain jurisdiction to enforce all injunctive orders.

**COUNT VI – Attendance-Record Falsification & Whistle-Blower Retaliation**

*First & Fourteenth Amendments – 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. This claim arises under 42 U.S.C. § 1983 for violations of the First Amendment's protections for free speech and petition and the Fourteenth Amendment's guarantee of procedural due process in accurate educational records, based on Defendants' retaliation against whistle-blowing and falsification of official data.

*FACTUAL ALLEGATIONS*

3. <u>Ratification by Senior Officials & Educational Void</u>

    a. On April 2 2025, at 5:23 p.m., Plaintiff e-mailed Student Services Director **Dr. Shellie Wood,** Instructional Superintendent **Eric Bethel,** and Principal **Danielle Singh** to arrange a bullying-investigation meeting that would not further disrupt instruction. The e-mail noted that Assistant Principal **Niki Ugel** had already granted Plaintiff **E.K.S.C.** a one-and-a-half-day excused absence because Singh had approved the temporary class change and  E.K.S.C.'s new homeroom teacher "*got her cubby ready,*" and that  E.K.S.C. had also missed half of Tuesday for the same reason.

b. The April 2 2025 email gave Wood, Bethel, and Singh contemporaneous notice that Assistant Principal Ugel had already coded a *one-and-a-half-day* excused absence for E.K.S.C. because no suitable classroom was available. By failing to correct the coding directive—or to arrange an immediate alternative placement—these senior officials ratified the underlying attendance miscoding and left Plaintiffs with *no school to send their children to for 1.5 days*.

c. This administrative inaction deepened the harm by creating an educational void, compounding the loss of instructional time and amplifying the impact of the falsified records.

4. <u>Orders to Falsify Attendance</u>

a. Earlier on April 2 2025, Administrative Assistant **Kelly Mastracchio** informed Plaintiff—and provided a contemporaneous audio recording—that Singh and Ugel had ordered her to mark absent **students** *"present"* in the ASPEN attendance system. Mastracchio refused, invoking the DCPS Attendance Policy and student-safety obligations.

b. Recording students as present when they were absent contravened DCPS policy, compromised emergency head counts, skewed truancy data used for federal and District reporting, and deprived students of their constitutionally protected property interest in accurate educational records.

5. <u>Retaliation Against the Whistle-Blower</u>

a. Upon Mastracchio's refusal, Singh and Ugel threatened her with negative performance evaluations, bullied her at the attendance desk, and, in June 2025,

eliminated her position altogether—retaliatory actions that chilled lawful
whistle-blowing.

6. District-Level Ratification and Cover-Up

   a. Superintendent Bethel subsequently "*froze*" the ASPEN module, blocking all
   corrections and retroactively reversing excused codes, including those entered on
   May 15–16 2025. Attendance for Plaintiffs' children remains frozen and
   inaccurate.

   b. On May 10 2025 Plaintiff forwarded the audio file and transcript to the **Office of
   the State Superintendent of Education ("*OSSE*")** and to **DCPS leadership**
   under the subject line "*Evidence of Attendance-Record Falsification at Janney
   ES.*" OSSE never responded, and DCPS likewise ignored the submission. **CARE
   investigator Mark James** told Plaintiff that "*[Mastracchio] doesn't have to talk,*"
   confirming the District's refusal to investigate.

7. Protected Disclosure by Mastracchio

   a. Mastracchio's refusal to falsify attendance data and her disclosure to Plaintiff
   constituted speech by a public employee, as a citizen, on a matter of public
   concern—the integrity of government records—protected by the First
   Amendment under Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

   b. The threats, reassignment, and eventual elimination of Mastracchio's position
   were adverse actions causally linked to her protected speech.

   c. Deliberate falsification of attendance records violated clearly established
   Fourteenth-Amendment due-process rights in accurate official records. See
   Buckley v. Fitzsimmons, 509 U.S. 259, 276-77 (1993).

*MUNICIPAL LIABILITY (Monell)*

8.  Bethel's ASPEN freeze, CARE's refusal to interview Mastracchio, and OSSE's inaction
    demonstrated a District-wide policy, custom, or practice of data falsification and
    whistle-blower retaliation, rendering the District liable under Monell v. Dep't of Soc.
    Servs., 436 U.S. 658 (1978). Singh, Ugel, Reid, Bethel, and Wood each ratified or
    acquiesced in the misconduct.

*INJURIES*

9.  Plaintiffs sustained

    a.  ongoing loss of truthful attendance records,

    b.  impeded truancy interventions and after-school eligibility,

    c.  emotional distress, and

    d.  litigation and administrative expenses.

10. Mastracchio—who remains willing to testify—suffered reputational harm and loss of
    employment.

11. All injuries were the foreseeable result of Defendants' unlawful conduct.

*CLAIMS FOR RELIEF*

12. <u>Declaratory Relief</u>

    a.  Plaintiffs request a declaration that Defendants' attendance-record falsification
        and retaliatory conduct violated the First and Fourteenth Amendments.

13. <u>Injunctive Relief</u>

    a.  Plaintiffs request that the Court enjoin Defendants, within 15 days, to:

        i.  expunge and correct all falsified ASPEN entries;

14. <u>Damages</u>

    a.  Plaintiffs seek nominal and compensatory damages, together with costs and reasonable attorney's fees under 42 U.S.C. § 1988.

15. <u>Further Relief</u>

    a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

16. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on Count VI against all Defendants, jointly and severally, and award the declaratory, injunctive, monetary, and further relief set forth above.

**COUNT VII – Systemic Violations of Mandatory Grievance Procedures**

*§ 504 of the Rehabilitation Act; Title II of the ADA; U.S. Const. amends. I & XIV; 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. Section 504 and Title II require public entities to provide persons with disabilities a *"prompt and equitable"* grievance procedure; denial of that process constitutes unlawful discrimination.

3. Defendants, acting under color of District of Columbia law, also violated Plaintiffs' First-Amendment right to petition and Fourteenth-Amendment procedural guarantees, for which 42 U.S.C. § 1983 affords redress.

4. Because the challenged acts arose from an official policy or custom, Defendant District of Columbia is liable under Monell.

*FACTUAL ALLEGATIONS*

5. <u>Regulatory Requirements</u>
   a. Federal regulations mandate a *"prompt and equitable"* disability-grievance process. See 34 C.F.R. § 104.7; 28 C.F.R. § 35.107.

6. <u>Volume of Grievances</u>

    a. Between 18 December 2024 and 17 July 2025, Plaintiffs filed **68 written safety grievances**.

    b. Those grievances triggered **268 statutory or internal deadlines**, including **Janney ES 10-day, C.A.R.E. 1-, 2- and 30-day, and Chief Integrity Office 48-hour and 3–5-day** requirements.

7. <u>Systemic Deadline Failures</u>

    a. Defendants breached **240 of the 268 deadlines—an 89.6 percent failure rate**.

    b. The **missed-deadline** breakdown is:

        i. Principal Singh 10-day letters—58 of 64 missed (**90.6 %**);

        ii. C.A.R.E. 1-day acknowledgments—35 of 46 (**76.1 %**);

        iii. C.A.R.E. 2-day investigator assignments—44 of 46 (**95.7 %**);

        iv. C.A.R.E. 30-day Letters of Resolution—46 of 46 (**100 %**);

        v. Chief Integrity Office 48-hour replies—25 of 33 (**75.8 %**); and

        vi. Chief Integrity Office 3–5-day findings—32 of 33 (**97 %**).

    c. Outstanding deadlines now average approximately 50 business days (**median 46**); 53 grievances have been stalled more than 30 business days, 34 more than 45, and 11 more than 60, the longest persisting 77 business days without resolution.

8. <u>Admissions of Deliberate Delay</u>

    a. On 6 May 2025 C.A.R.E. **Investigator Tron Riley** admitted that he and colleague **Crystal Goode** "*game-planned*" to leave complaints untouched for five weeks.

    b. On 23 June 2025 **Investigator Mark James** promised to issue Letters of Resolution "*this week,*" yet none issued;

    c.  On 7 July 2025 Mark writes again, "*It is in the approval process right now and will be completed and sent to you ASAP.*" yet none issued;

9.  <u>Diversion of Complaints</u>

    a.  **Superintendent Bethel's** ongoing Calendly solicitation diverts parent complaints outside the official tracking system, stripping them of regulatory safeguards.

*MUNICIPAL LIABILITY (Monell)*

10. The 89.6 percent failure rate, its fourth-month duration, and the direct participation of senior officials—including **Principal Singh,** Superintendent Bethel, **C.A.R.E.,** and the **Chief Integrity Office**—demonstrate an official policy or custom of non-compliance, not isolated error.

INJURIES

11. Defendants' conduct

    a.  deprived Plaintiffs of the federally guaranteed grievance mechanism,

    b.  chilled their exercise of First-Amendment rights, and

    c.  left unremediated physical hazards endangering students with disabilities.

*CLAIMS FOR RELIEF*

12. <u>Declaratory Relief</u>

    a.  Plaintiffs request a declaration that Defendants' systemic failure to meet mandatory grievance deadlines violates § 504, Title II of the ADA, and the First and Fourteenth Amendments.

13. Injunctive Relief

    a.  Plaintiffs request that the Court enjoin Defendants to:

        i.  to comply with every statutory and internal grievance deadline.

14. Damages

    a.  Plaintiffs seek

        i.  nominal damages under § 504 and Title II of the ADA, and

        ii.  compensatory damages under 42 U.S.C. § 1983.

15. Further Relief

    a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

16. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor consistent with the foregoing claims for relief and award such additional relief as justice requires.

**COUNT VIII – Constructive Suspension Without Due Process**

*Fourteenth Amendment; 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1.  Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2.  The Fourteenth Amendment guarantees public-school students a property interest in continued education and requires notice and a hearing before the State may impose a suspension exceeding ten school days.

3.  Acting under color of District of Columbia law, **DCPS and its officials** deprived the **Clark children** of that interest by excluding them from school for ten consecutive instructional days without the due-process safeguards mandated by 42 U.S.C. § 1983.

*FACTUAL ALLEGATIONS*

4.  On 9 May 2025 a documented noise-hazard incident at **Janney Elementary** forced an early pickup of the Clark children, and DCPS did not remedy the hazard thereafter.

5.  From 12 May through 23 May 2025 the children remained out of school for ten consecutive instructional days—about sixty classroom hours—because the hazard persisted.

6.  On 14 May 2025 **Instructional Superintendent Eric Bethel** emailed: *"Thank you for reaching and sharing your concerns. This email is to acknowledge receipt and to confirm that the Janney attendance staff will appropriately code your daughter's absences as*

*excused. Please let me know if you have any additional attendance questions or requests.*"

7. At 10:13 a.m. on 16 May 2025—less than forty-eight hours after the parent filed nineteen written safety grievances—Bethel reversed course: "*I'm writing to inform you that we are unable to excuse your children's absences based on the reasons provided. In order to remain in compliance with legal requirements, it is important that your children attend school daily.*" No notice of charges, hearing opportunity, or alternative educational services accompanied this reversal.

8. The parent protested at 12:54 p.m. on 16 May 2025, but DCPS remained silent until a Teams call on 19 May 2025.

9. During that recorded call Bethel conceded that his 14 May excusal email had been a "*mistake,*" admitted that the District had received "*none*" of the "*reasons*" he claimed were lacking, and still offered no interim placement, tutoring, or home-hospital instruction.

10. On 21 May 2025 Principal Singh refused to move E.K.S.C. to a different homeroom, leaving the original hazard intact.

11. DCPS's only written proposal—a "*Student Support & Success Plan*" sent on 23 May 2025—conditioned the children's return on a restorative circle scheduled for 28 May 2025, thereby extending the educational void.

12. The children re-entered partially on 27 May 2025 without make-up instruction, while every grievance remained unanswered past the one-, two-, and thirty-day deadlines.

*MUNICIPAL LIABILITY (Monell)*

13. These facts constitute a constructive suspension exceeding ten school days without the procedural protections mandated by Goss v. Lopez, 419 U.S. 565 (1975).

14. The timing of Bethel's reversal—hours after the nineteen grievances—and his later admission that no new information existed support a reasonable inference that the recoding was retaliatory for protected petition activity.

15. Under Monell, the District is liable because

    a. DCPS maintains an unwritten policy or custom of ignoring safety grievances and withholding educational services during safety-related absences, and

    b. Bethel, a final policymaker for attendance, personally ordered and ratified the unlawful recoding.

*INJURIES*

16. The constructive suspension deprived the children of roughly sixty hours of instruction, worsening E.K.S.C.'s fragile academic standing; she continues to score "*2*" in math despite parent-funded tutoring.

17. It also exposed the family to truancy penalties, required out-of-pocket tutoring expenses, and inflicted significant emotional distress on both children and their parent.

*CLAIMS FOR RELIEF*

18. Declaratory Relief

    a. Plaintiffs request a declaration that the 16 May 2025 attendance reversal and ensuing ten-day educational void violated the Fourteenth Amendment.

Case 1:25-cv-02050-RCL  Document 14    Filed 07/21/25    Page 42 of 60

19. Injunctive Relief

    a.  Plaintiffs request that the Court enjoin Defendants to:

        i.  restore the disputed absences to "*excused*";

        ii.  provide Goss-compliant notice and a hearing before any future suspension; and

        iii.  supply interim educational services whenever safety concerns bar attendance.

20. Damages

    a.  Plaintiffs seek compensatory and nominal damages for lost instruction, emotional harm, and related expenses.

21. Further Relief

    a.  Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

22. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor, declare the challenged actions unconstitutional, enjoin the District of Columbia in the manner set forth above, award compensatory and nominal damages, and grant such further relief as the Court deems just and proper.

**COUNT IX – Unreasonable Seizure, Strip-Search, and Retaliatory Abuse-Report**

*Fourth & Fourteenth Amendments – 42 U.S.C. § 1983; Monell*

*INCORPORATION BY REFERENCE*

1. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. Defendants, acting under color of District of Columbia law, seized and strip-searched minors without court authorization, parental consent, exigent circumstances, or reasonable suspicion grounded in truthful information, in violation of the Fourth Amendment.

3. The same conduct shocked the conscience and violated substantive due-process protections of the Fourteenth Amendment.

4. **Dr. Shellie Wood's** fabricated CFSA report furthered a pattern of retaliation against Plaintiff's protected grievance activity, thereby infringing the First Amendment as cross-referenced in Count III.

5. D.C. Code § 4-1321.05 shields only good-faith reporters; knowingly supplying false information forfeits that immunity. The right to be free from baseless strip-searches was clearly established; no reasonable official could have believed the seizure lawful. See Safford Unified Sch. Dist. v. Redding, 557 U.S. 364 (2009).

*FACTUAL ALLEGATIONS*

6.  On June 9, 2025, **Plaintiff** emailed **Dr. Wood, Principal Singh**, and others that her daughter **E.K.S.C.** was experiencing suicidal ideation and panic related to prior classroom incidents.

7.  On June 10, 2025, at approximately 9:30 a.m., Dr. Wood telephoned the D.C. **Child & Family Services Agency ("CFSA")** and alleged that Plaintiff had *"entered the school in an intimidating manner,"* despite the prior warning of E.K.S.C.'s fragile mental state.

8.  Audio recordings later reviewed by CFSA showed no shouting, threats, or rule violations by Plaintiff.

9.  **CFSA investigators** and **Metropolitan Police officers** removed E.K.S.C. (age 11) and her sister **C.A.C.** (age 8) from class without parental notice, ordered them to strip to their underwear, and interrogated them about private parts, home conditions, and Plaintiff's behavior.

10. During the seizure E.K.S.C. texted her mother: *"I was worried a police officer had to come and shoot you down or something."*

11. CFSA closed the case the same day as *"unsubstantiated."* The assigned **social worker Darlene Richardson** told Plaintiff, after viewing the footage, that she had *"done nothing wrong"* and should *"cover yourself—staff are trying to intimidate you."*

12. Plaintiff's own CFSA neglect report, filed May 22, 2025, regarding staff conduct received no follow-up, underscoring CFSA's arbitrary and discriminatory deployment.

13. Within days, Dr. Wood and **Assistant Principal Niki Ugel** appeared uninvited at both children's classroom activities—standing in doorways, participating in class circles, and watching intently—conduct the family perceived as intimidation.

14. As of filing, the **District of Columbia Public Schools ("*DCPS*")** has not contacted the family to apologize, explain, or offer counseling despite knowing  E.K.S.C.'s pre-existing anxiety and suicidal thoughts.

*MUNICIPAL LIABILITY (MONELL)*

15. As Student Services Director, Dr. Wood possessed delegated authority over safety referrals at **Janney Elementary**; her knowingly false report therefore constituted District policy.

16. Principal Singh and **Superintendent Bethel** took no corrective action after learning the report was false and unsubstantiated, demonstrating deliberate indifference and de-facto ratification.

17. The CFSA episode follows repeated grievance-deadline violations and Bethel's attendance recoding (Count VIII), evidencing a municipal custom of punishing parent advocacy.

*INJURIES*

18.  E.K.S.C. and C.A.C. suffered humiliation, recurrent nightmares, heightened anxiety, and incurred therapy and psychiatric costs.

19. Plaintiff suffered emotional distress, medical expenses, and lost work hours managing the crisis.

*CLAIMS FOR RELIEF*

20. <u>Declaratory Relief</u>

   a. Plaintiffs request a declaration that the June 10, 2025 seizure and strip-search of

      E.K.S.C. and C.A.C. violated the Fourth and Fourteenth Amendments.

21. <u>Injunctive Relief</u>

   a. Plaintiffs request that the Court enjoin Defendants from:

      i. initiating child-abuse reports without a reasonable factual basis; and

      ii. withholding notice to parents absent court order or exigent circumstances.

22. <u>Damages</u>

   a. Plaintiffs seek compensatory damages for emotional distress, therapy, and related

      costs, and punitive damages against Dr. Shellie Wood in her individual capacity

      for malicious fabrication of abuse allegations.

23. <u>Further Relief</u>

   a. Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

24. WHEREFORE, Plaintiffs respectfully request that the Court declare that the June 10,

    2025 seizure and strip-search violated the Fourth and Fourteenth Amendments; enjoin

    DCPS staff as set forth above; award compensatory and punitive damages; and grant such

    further relief as the Court deems just and proper.

**COUNT X – Failure to Implement the Written *"Student Support & Success Plan"***

*§ 504 of the Rehabilitation Act, Title II of the ADA, and 42 U.S.C. § 1983 (Monell)*

*INCORPORATION BY REFERENCE*

1. Plaintiffs realleged and incorporated by reference the preceding paragraphs as if fully set forth herein.

*JURISDICTION & LEGAL BASIS*

2. Section 504 and Title II prohibit public-school discrimination against qualified students with disabilities and require reasonable modifications that afford meaningful educational access, 34 C.F.R. § 104.33–.37; 28 C.F.R. § 35.130.

3. **Defendants** approved a feasible, cost-free accommodation on 23 May 2025, then repeatedly failed to implement or to train substitutes, thereby denying **Plaintiff E.K.S.C.** equal educational opportunity.

4. Under 42 U.S.C. § 1983, Defendants acted under color of District law and—with deliberate indifference—violated  E.K.S.C.'s substantive due-process and equal-protection rights by ignoring known panic-attack triggers.

5. Because these violations flowed from District customs, policies, and failures to train, municipal liability attaches pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), City of Canton v. Harris, 489 U.S. 378 (1989), and D.C. v. Doe, 611 F.3d 888, 896-97 (D.C. Cir. 2010).

*FACTUAL ALLEGATIONS*

6. On 23 May 2025 LICSW **Sara Solomon** and Becomings **Manager Heather Kurtz** issued a written "*Student Support & Success Plan*" for E.K.S.C.. The plan stated: "*When classroom noise escalates, E.K.S.C. will be released to an alternate supervised location.*"

7. On 27 May 2025 a substitute delivered no ELA lesson; noise escalated;  E.K.S.C. was escorted to the office and lost the entire period, contrary to the plan's goal of preserving instruction.

8. On 30 May 2025 two substitutes denied  E.K.S.C.'s request to leave a loud room. E.K.S.C. fled to a restroom in tears and texted Plaintiff. Solomon intervened only after the panic attack.

9. That afternoon Digital-Art teacher Shana Zallman told  E.K.S.C., "*You can't make up work because you were absent,*" displaying hostility in front of classmates.

10. During a 2 Jun 2025 meeting Solomon admitted that

    a. "*the plan was not followed on 30 May,*"

    b. front-office staff were unaware of the protocol,

    c. no-contact-order violations involving Ms Smith "*keep happening,*" and

    d. the homeroom remained a "*hotspot.*"

11. Superintendent Eric Bethel then ordered clerks to "*freeze*" ASPEN, leaving hazard-related absences uncoded in violation of 5-B DCMR § 2103.1's 24-hour entry rule.

12. Still-unremedied hazards, documented in Exhibit D, included blank visitor sign-out logs and a fourth breach of the Ms Smith separation plan.

13. The plan required a daily "*check-in/check-out*" ("*CICO*") with Solomon before the bell. Solomon attended an overnight field trip on 9–11 Jun 2025; Dr. Wood failed to substitute, and E.K.S.C. roamed the halls unsupervised on 9–10 Jun 2025 even after Plaintiff's 9 Jun email warning that E.K.S.C.'s panic was tipping into suicidal ideation.

14. On 11 Jun 2025 Principal Singh and Kurtz met with Plaintiff to add absence-contingency language, but no signed § 504 plan emerged. Plaintiff asked that Dr. Wood be removed from oversight given her prior failures.

15. Solomon and Kurtz promised a revised plan; as of 8 Jul 2025 no updated document existed, and Plaintiff's follow-up email remained unanswered.

16. ASPEN records dated 8 Jul 2025 confirmed both Clark children were re-enrolled for SY 2025-26, underscoring the need for ongoing relief.

17. E.K.S.C. experienced multiple panic attacks, academic regression (near-failing "*2*" in Math), and continues therapy. Physicians and therapists have stated their willingness to provide records establishing clinically significant anxiety attributable to these breaches.

*MUNICIPAL LIABILITY (Monell)*

18. A District custom of non-enforcement existed: substitutes received no training on accommodation plans, front-office staff were unaware of protocols, and the ASPEN "*freeze*" blocked accountability.

19. Superintendent Bethel and Principal Singh ratified these failures after the 2 Jun 2025 admissions yet took no corrective action, allowing breaches to continue.

20. The absence of any mechanism to brief substitutes on individualized plans constitutes an actionable failure to train, meeting the standards articulated in City of Canton v. Harris, 489 U.S. 378 (1989).

*INJURIES*

21. E.K.S.C. suffered panic attacks, loss of instruction, academic regression, clinically significant anxiety and depression linked to the school's continuing volatility, and ongoing psychological treatment.

22. Plaintiffs incurred tutoring and counseling costs, and suffered emotional distress.

*CLAIMS FOR RELIEF*

23. Declaratory Relief

    a. Plaintiffs request a declaration that Defendants violated § 504, ADA Title II, and the Fourteenth Amendment.

24. Injunctive Relief

    a. Plaintiffs request that the Court enjoin Defendants, within 45 days, to:

        i.   finalize and distribute a revised Support & Success Plan for E.K.S.C.;

        ii.  unfreeze and correct all hazard-related attendance codes.

25. Damages

    a. Plaintiffs seek nominal and pecuniary damages under § 504/ADA Title II and compensatory damages, including emotional-distress damages, under § 1983.

26. Further Relief

    a. Plaintiffs seek all other relief the Court deems just and proper.

*PRAYER FOR RELIEF*

27. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor, declare Defendants' conduct unlawful, enjoin the District of Columbia Public Schools to implement and monitor E.K.S.C.'s accommodations, award nominal,

compensatory, and any other appropriate damages, and grant such further relief as the Court deems just and proper.

### FEDERAL & DISTRICT OVERSIGHT FINDINGS CONFIRM SYSTEMIC SAFETY NON-COMPLIANCE

1. Multiple independent oversight bodies have recently documented pervasive, district-wide safety and compliance failures within District of Columbia Public Schools ("*DCPS*"). These findings corroborate Plaintiffs' allegations that the injuries described herein were the foreseeable—and foreseen—result of an official custom of deliberate indifference.

*U.S. Department of Education – Office for Civil Rights (OCR)*

2. On **March 5, 2025**, OCR opened a directed, district-wide investigation into whether DCPS "***denies students with disabilities timely evaluations, services, and safe transportation, imposing significant burdens on those students and their families***." (Ex. A, OCR Letter, at 1). The letter places senior policymakers on actual notice that DCPS's disability-services failures are systemic and ongoing.

*U.S. Commission on Civil Rights – D.C. Advisory Committee Report*

3. The Commission's **December 2024** report, *Accessing Services for Students with Disabilities in DC Public Schools*, found that the District "***leads the nation in due-process complaints per 10,000 students***" and that its special-education transportation system is plagued by "***long delays, unreliable schedules, and lax oversight***," causing "*significant harm*" to students. (Ex. B at 33).

*D.C. Office of the Inspector General (OIG) – Measures to Combat Gun Violence in DC Public Schools*

4. The OIG's **July 17, 2025** evaluation concluded that "***50 percent of safety- and security-related repairs—including broken doors, locks, windows, and communication systems—exceeded*** the District's own ***45-day completion benchmark, creating fundamental vulnerabilities****.*" (Ex. C at ii). DCPS agreed that full remediation will not occur until **June 2026**. (Id. at 18).

*OIG – District Compliance with the Home Rule Act, PPRA, and District Code (Part I: DCPS)*

5. In **July 2025** the OIG further reported that DCPS "***executed multi-million-dollar contracts without required Council approval or publication***" and maintained "***inadequate record-retention and supervisory controls****.*" (Ex. D at 1, 11). These governance lapses demonstrate a culture of non-compliance that extends to student-safety obligations.

*OIG – Special Education Attorney Certifications (FY 2023)*

6. The OIG's **October 16, 2024** audit found that DCPS paid **$3.1 million in IDEA attorney fees in FY 2023** yet, *five years after a 2019 recommendation*, still "***lacks a database to track IDEA complaints and their outcomes****.*" (Ex. E at 13–14). The continuing failure to implement basic tracking tools reflects deliberate indifference, not mere oversight.

*PERB Decision – Samantha Brown v. DCPS, Op. No. 1877 (July 8, 2024)*

7. The D.C. Public Employee Relations Board determined that DCPS **retaliated against a teacher-union representative and created a "*hostile work environment***"** in violation of the Comprehensive Merit Personnel Act. (Ex. F at 6–7). This decision underscores a district culture tolerant of retaliation and non-compliance with legal mandates.

## JUDICIAL-NOTICE REQUEST

8. Pursuant to Fed. R. Evid. 201(b)(2) and (c)(2), Plaintiffs respectfully request that the Court take judicial notice of the public reports and agency decisions attached hereto as Exhibits A–F, each of which constitutes a public record of a governmental body posted on the issuing agency's official website.

## MONELL-SPECIFIC ALLEGATIONS

1. The oversight findings in Paragraphs 55-61 establish that **senior DCPS policymakers were repeatedly apprised—no later than March 5, 2025—of systemic hazards and compliance failures identical to those that injured Plaintiff E.K.S.C.** Despite this notice, DCPS *affirmatively chose* not to implement timely repairs, grievance-tracking systems, or disability accommodations, thereby exhibiting deliberate indifference.

2. DCPS's longstanding failure to (a) remedy safety-critical infrastructure within the 45-day benchmark, (b) develop mandated IDEA-complaint databases, and (c) comply with federal disability-access mandates is an **official custom** and the **moving force** behind the injuries alleged herein.

3. The same failures render futile any argument that Plaintiffs' injuries arose from isolated negligence; rather, they flow directly from "*deep-rooted and well-settled*" practices of non-engagement documented by multiple oversight entities.

## INJUNCTIVE-RELIEF ENHANCEMENT

66. Because the OIG reports state that full implementation of safety repairs will not be completed until **June 2026**, Plaintiffs face a real and immediate threat of future harm absent judicial intervention. Plaintiffs therefore renew their request for injunctive relief, including.

   a.  A court-appointed monitor for a period of two academic years;

   b.  Quarterly status reports from DCPS on

      i.  completion of safety-critical work orders and

      ii.  IDEA complaint backlogs; and

   c.  A directive that DCPS produce, within 90 days, a publicly searchable database of IDEA complaints and outcomes.

## DAMAGES

1. <u>Economic losses to date</u>

    a. **$63,459** in lost earnings, travel, and document-production costs.

2. <u>Future pecuniary losses</u>

    a. approximately **$15,660** in therapy (116 sessions × $130), and

    b. **$5,500** in tutoring (20 hours × $275).

3. <u>Emotional-distress damages:</u>

    a. recoverable only under § 1983 counts III, VI, VIII, IX

    b. **not less than $475,000**, to be proven at trial.

4. <u>Statutory damages:</u>

    a. Nominal damages on each ADA II and § 504 claim;

    b. Full reimbursement of medical, therapy, and tutoring outlays.

5. <u>Punitive damages</u>

    a. sought **only against Dr. Shellie Wood** in her individual capacity on Count IX for knowingly filing a false CFSA report.

6. Proceeding pro se, Plaintiff cannot presently claim attorney's fees; however, under 42 U.S.C. § 1988(b), 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205, Plaintiffs reserve the right to seek reasonable fees and costs should counsel later appear.

7. Any award here shall be offset against any recovery in Superior Court to prevent double recovery.

## RESERVATION OF STATE-LAW CLAIMS ¶ 36

1. Plaintiffs expressly reserve, pursuant to **28 U.S.C. § 1367(d)**, all local-law causes of
   action set out in the Second Amended Complaint (e.g., negligence per se, D.C. Human
   Rights Act, D.C. Whistle-blower Protection) and will seek severance and remand at the
   appropriate procedural juncture.

## MATERIAL AMENDMENTS SINCE THE THIRD AMENDED COMPLAINT ¶ 37-42

1. Removes all local-law counts (now reserved).
2. Clarifies capacities of Dr. Wood (individual and official).
3. Updates damages paragraph to eliminate any punitive-damage demand against the
   District.
4. Adds procedural history and consent-schedule language (¶¶ 20–23).
5. Updates jurisdiction section to cite Perez exhaustion rule.
6. Adds reservation of state-law claims (¶ 36).

## PRAYER FOR RELIEF

1.  WHEREFORE, Plaintiffs respectfully request that the Court:

    a.  **Declare** that Defendants' acts and omissions violated § 504, ADA II, and the First and Fourteenth Amendments as alleged in Counts I–X;

    b.  **Enjoin** Defendants, pending final judgment, to:

        i.   convene a § 504 safety-planning meeting within **ten (10) days**;

        ii.  implement interim safety measures identified in Counts I–X; and

        iii. comply with all grievance-response timelines;

    c.  After trial, **enter judgment** awarding:

        i.   nominal, compensatory, and (as to Dr. Wood) punitive damages in the amounts proven;

        ii.  pre- and post-judgment interest as allowed by law; and

        iii. costs and, if counsel appears, reasonable attorney's fees under 42 U.S.C. § 1988(b), 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205;

    d.  Retain jurisdiction to enforce all injunctive orders; and

    e.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Emmy Grace Clark

Emmy Grace Clark (pro se, next friend)

4317 River Rd NW, Apt 3, Washington, D.C. 20016

771-233-2293

emmygraceclark@gmail.com